# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

CLAIRE KILLIN,

    *Plaintiff*,

    v.

BUTTERCUP CT, LLC; BRUCE THOMAS;
DINART SERPA; and ALANA CALVO,

    *Defendants*.

No. 3:24-cv-01613-MPS

## RULING ON MOTION TO DISMISS

This action arises from the employment and dismissal of Plaintiff Claire Killin from a Dunkin' franchise location in East Lyme, Connecticut. Killin sues the owner of the franchise, Buttercup CT, LLC, its owners and managers, Bruce Thomas and Dinart Serpa, and the manager of the East Lyme Dunkin' location during Plaintiff's employment, Alana Calvo. In her complaint, Plaintiff alleges sex-, race-, and national origin-based discrimination, creation of a hostile work environment, and unlawful retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e, *et seq.* (Counts One and Two), 42 U.S.C. § 1981 (Count Three), and the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. § 46a-60 (Counts Four and Five), as well as breach of the covenant of good faith and fair dealing in her employment contract (Count Six), tortious infliction of emotional distress (Counts Ten and Eleven), intrusion upon seclusion (Count Twelve), and several other state and federal violations.

Defendants move to dismiss Counts 1–6 in their entirety, and 10–12 with regard to Thomas and Serpa, under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted. ECF No. 13-1 at 1. In her opposition brief, Plaintiff states that she does not oppose dismissal of Counts 10–12 with regard to Thomas and Serpa. ECF No. 18 at 1–2. Counts

10–12 are therefore dismissed as to Thomas and Serpa.  Thus, only Counts One through Six remain at issue.  As I explain more fully below, I GRANT in part and DENY in part the Defendants' motions to dismiss.

## I.    LEGAL STANDARD

For a complaint to survive a motion to dismiss brought under Fed. R. Civ. P. 12(b)(6), it must "contain sufficient factual matter, accepted as true, to state a claim that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).  "The plausibility standard is not akin to a 'probability requirement,' but asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*.  A claim has facial plausibility when the pled factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*.  A plaintiff need not provide detailed factual allegations, but must provide the grounds of its entitlement to relief beyond mere "labels and conclusions." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  The Court is required to view the complaint liberally, accepting all factual allegations in the complaint as true and drawing all reasonable inferences in the plaintiff's favor. *Nicosia v. Amazon.com, Inc*., 834 F.3d 220, 230 (2d Cir. 2016).

## II.    FACTUAL AND PROCEDURAL BACKGROUND

The following factual allegations are drawn from Plaintiff's complaint, ECF No. 1, and I accept them as true for the purpose of this motion.

Plaintiff is a Caucasian female of British nationality, ECF No. 1 ¶¶ 19–20.  She was employed at a Dunkin' franchise ("Dunkin'") located in East Lyme, Connecticut, from 2022 until her termination on May 12, 2023. *Id.* ¶ 46, 71.  Defendant Alana Calvo was the store manager at the East Lyme Dunkin' during this time. *Id.* ¶ 18.  Defendants Bruce Thomas and Dinart Serpa are the owners of Buttercup, LLC, which owns the East Lyme Dunkin' location. *Id*. ¶¶ 17–18.

During her employment, Plaintiff alleges that she suffered several categories of discriminatory harassment by the Dunkin' staff.  According to the complaint, employees "embarrass[ed], bull[ied], and harass[ed]" her in a work-related WhatsApp group chat, *id.* ¶ 35, "mocked" her British accent, *id.* ¶ 41, and made "derogatory harassing comments" about her skin color and red hair, *id.* ¶ 45.  Her complaint contains the following specific examples of this alleged behavior: She was falsely accused in the group chat of writing "tramp" on a cup.  *Id.* ¶ 35.  Employees made "despicable comments" to Plaintiff about the death of Queen Elizabeth II around the time of the Queen's death.  *Id.* ¶ 46.  One employee, Marina Slager, engaged in "name calling" and "derogatory comments" about Plaintiff's nationality and hair color.  *Id.* ¶ 40.

Killin alleges that Stephen Nicholson, a former employee at the East Lyme Dunkin', stalked Killin, made sexual comments, made threats of physical harm and arson toward her and her family, and performed "inappropriate aggressions" toward her throughout her employment and following her termination.  *Id.* ¶¶ 24, 28, 98.  She alleges that Nicholson threatened Plaintiff, her family, and others close to her with personal harm and arson.  *Id.* ¶ 98.  He purchased an identical shirt to Plaintiff and wore it to work to spark conversation.  *Id.* ¶ 30.  Following Plaintiff's termination, in October 2023, Nicholson made unwanted physical contact with Killin while in his car.  *Id.* ¶ 103.  He also forced her to purchase items with his credit card.  *Id.* ¶ 101.  While at Dunkin', Plaintiff reported Nicholson's behavior to management "on several occasions . . . verbally and in writing."  *Id.* ¶ 36.

Plaintiff also experienced a vexed relationship with Calvo.  Plaintiff alleges that Calvo encouraged Nicholson to sexually harass her, "embarrass[ed], bull[ied], and harass[ed]" plaintiff via the WhatsApp chat and allowed the other defendants to do the same, and took no action against Plaintiff's harassment by the staff.  *Id.* ¶¶ 25, 35, 36.  At Nicholson's request, Calvo provided him

with Plaintiff's address, phone number, email address, which Plaintiff had given to Buttercup for employment-only purposes. *Id.* ¶ 26. Calvo drank during working hours, encouraged employees to do the same, and encouraged "assailant [sic] managers" to "pass out" alcohol to "minors at work." *Id.* ¶¶ 31–32. She demanded Plaintiff serve moldy bread and insect-infested food, which Plaintiff declined to do. *Id.* ¶ 56. Finally, Calvo also reduced Plaintiff's working hours because she believed Plaintiff to be flirting with her boyfriend, as well as for what Plaintiff asserts were discriminatory reasons and in retaliation for Plaintiff reporting harassment and misconduct. *Id.* ¶¶ 53, 59.

Plaintiff reported Calvo's alcohol use "and misconduct" to Buttercup HR, *id.* ¶ 33, as well as the "harassment and discrimination" she experienced, *id.* ¶ 65, and reported Nicholson's sexual harassment to "management," *id.* ¶ 36. She also describes issuing several "complaints" for bullying based on national origin, sexual harassment, and workplace sabotage. *Id.* ¶ 63. Plaintiff asserts that these complaints did not lead to investigations and made her situation "significantly worse." *Id.* ¶¶ 38, 66.

In January 2023, Defendants issued Plaintiff three write-ups for improper store closure. *Id.* ¶¶ 60–61. Plaintiff asserts that other employees who engaged in the same conduct were not issued write-ups, and she attributes the discrepancy to "discrimination" and "retaliation." *Id.* Around May 5, 2023, Plaintiff was suspended on the basis of these write-ups. *Id.* ¶ 67. She was terminated on May 12, 2023. *Id.* ¶ 68.

Thereafter, Plaintiff lodged complaints with Buttercup regarding the "discrimination, harassment, stalking, and . . . wage discrepancies" she experienced as an employee at Dunkin', which she asserts have led to no investigation or resolution. *Id.* ¶¶ 72–73.

In the period following Plaintiff's termination, she continued to experience harassment.

Nicholson continued to stalk and harass her, which lead Plaintiff to seek criminal charges against him and aid the police in their investigation. *Id.* ¶¶ 64, 69, 88–89, 101. A neighbor sent her sexually explicit messages. *Id.* ¶ 87. Plaintiff was also subject to "false police reports, threats, and contrived eviction proceedings," which she attributes to her landlord. *Id.* Plaintiff's parents also left the United States in late 2023, leaving Plaintiff feeling isolated. *Id.*

Plaintiff claims her harassment by Nicholson and the Dunkin' staff left her "immobilized by grief, anxiety, mental suffering, fear, [and] depression," and suffering psychological trauma, stress, PTSD, anxiety, and "mental incapacitation" throughout this post-employment period. *Id.* ¶¶ 84, 98. During this time, she sought legal representation for her suit against Defendants, eventually meeting with four attorneys before her current representation. *Id.* ¶ 86.

In "mid-February 2024," Plaintiff first met with her current counsel, and she retained his services on March 7, 2024. *Id.* ¶ 90. Her counsel filed a Title VII complaint against Defendant Buttercup LLC with the Connecticut Commission on Human Rights and Opportunities ("CHRO") on March 8, 2024, 301 days after her termination from Dunkin'. *Id.* ¶ 90, 94. Her complaint was thus filed with the agency one day outside of the mandatory 300-day filing deadline for Title VII complaints. *Id.* ¶ 94.

The CHRO sent a "Release of Jurisdiction" letter to Plaintiff on July 11, 2024, and the United States Equal Employment Opportunities Commission ("EEOC") issued a "right to sue" letter on July 12, 2024. *Id.* at 29–30. Plaintiff thereafter filed this action on October 9, 2024.

## III.    DISCUSSION

Defendants assert several arguments in support of their motion to dismiss. First, the defendants argue that Plaintiff's claims of race-, sex-, color-, and national-origin based harassment, retaliation, and hostile work environment under Title VII and CFEPA (Counts 1–2 and 4–5) should

be dismissed because they were untimely filed. ECF No. 13-1 at 1. Second, Defendants assert

that plaintiff's claim for race-discrimination under § 1981 should be dismissed for failure to allege

facts sufficient to support a plausible claim of racial discrimination. *Id*. Third, Defendants argue

that Plaintiff's common-law claim for breach of good faith and fair dealing should be dismissed

for failure to state a plausible claim. *Id.* I discuss each argument below.

### A.  Equitable Tolling

Defendants first argue that Counts One, Two, Four, and Five should be dismissed as

untimely. Under both Title VII and the CFEPA, a charge of discrimination must be filed with the

EEOC and/or CHRO within 300 days of the alleged discriminatory act. 42 U.S.C. § 2000e–

5(e)(1); Conn. Gen. Stat. § 46a-82(f)(2). Plaintiff filed her administrative complaint 301 days after

her discharge from Dunkin', the last discriminatory act alleged. Plaintiff argues that the filing

deadline should be equitably tolled by one day for four reasons: (1) ignorance of her legal

requirements due to her young age, presence in a foreign country, and difficulty securing an

attorney, ECF No. 1 ¶ 86; (2) the distractions of participating in a criminal investigation during

that period, *id.* ¶ 89; (3) experiences of harassment by Nicholson, her landlord, and her neighbor

during the relevant period, *id.* ¶¶ 87–88; and (4) mental incapacitation stemming from the

harassment, *id.* ¶¶ 87, 98. In response, Defendants argue that Plaintiff does not allege

circumstances sufficiently extraordinary to warrant equitable tolling. ECF No. 19 at 2. I find that

Plaintiff has pled sufficient facts to warrant further consideration of her tolling claim.

The filing deadlines for formal complaints with the EEOC and CHRO are not

jurisdictional, and thus, like a statute of limitations, may be subject to equitable tolling. *Zerilli-*

*Edelglass v. New York City Transit Auth.*, 333 F.3d 74, 80 (2d Cir. 2003) (EEOC); *Williams v.*

*Comm'n on Hum. Rts. & Opportunities*, 777 A.2d 645, 650 (Conn. 2001) (CHRO). The Court has

discretion to find equitable tolling but "[t]his discretion is not absolute." *Doe v. United States*, 76 F.4th 64, 71 (2d Cir. 2023). "A litigant must demonstrate as a factual matter the existence of two elements: first, that some extraordinary circumstance stood in her way, and second, that she has been pursuing her rights diligently" during the period to be tolled. *Id.* (citation and internal quotation marks omitted).

Whether a person faced extraordinary circumstances depends "not [on] the uniqueness of a party's circumstances, but rather [on] the severity of the obstacle impeding compliance with a limitations period." *Harper v. Ercole*, 648 F.3d 132, 137 (2d Cir. 2011). "Ignorance of the law . . . [is] not sufficient grounds to warrant equitable tolling." *Barrett v. United States*, 961 F. Supp. 2d 403, 408 (D. Conn. 2013). But "mental incapacity, if satisfactorily shown, can be a proper basis for . . . tolling." *Mandarino v. Mandarino*, 180 F. App'x 258, 261 (2d Cir. 2006). As to the second element, "maximum feasible diligence" is not required, but only a showing that the litigant acted "as diligently as reasonably could have been expected under the circumstances." *Harper*, 648 F.3d at 138–39. In the absence of these elements, the court cannot extend the limitations period by even one day. *See Doe*, 76 F.4th at 71 ("The law prohibits a judge from exercising her discretion where these two elements are missing."); *Edo v. Antika Pizzeria Astoria, Inc.*, 852 F. App'x 618, 619 (2d Cir. 2021) ("In the absence of a recognized equitable consideration, the court cannot extend the limitations period by even one day." (citation and internal quotation marks omitted)). "Equitable tolling is only appropriate in rare and exceptional circumstances in which a party is prevented in some extraordinary way from exercising his rights . . . ." *Zerilli-Edelglass*, 333 F.3d at 80 (citations and internal quotation marks omitted).

The Second Circuit, however, has repeatedly advised that "equitable tolling often raises fact-specific issues premature for resolution on a Rule 12(b)(6) motion, before a plaintiff can

develop the factual record." *Clark v. Hanley*, 89 F.4th 78, 94 (2d Cir. 2023). This is especially true when a litigant requests tolling due to mental incapacity. *See Canales v. Sullivan,* 936 F.2d 755, 759 (2d Cir. 1991), *on reh'g*, 947 F.2d 45 (2d Cir. 1991) ("Where a claimant avers incapacity due to mental impairment . . . the district court should permit the claimant to present evidence in support of this claim."); *Mandarino*, 180 F.App'x at 261 ("When, as here, the facts are disputed, the best practice is to analyze a question of mental incapacity in the context of summary judgment."); *Szuszkiewicz v. JPMorgan Chase Bank*, 12 F. Supp. 3d 330, 339 n.5 (E.D.N.Y. 2014) ("The Second Circuit has repeatedly admonished that questions of mental capacity should not be resolved on a motion to dismiss . . . .") (collecting cases). Mental incapacitation does not toll a deadline "*per se;* determining whether equitable tolling is warranted in a given situation is a highly case-specific inquiry." *Bolarinwa v. Williams*, 593 F.3d 226, 232 (2d Cir. 2010) (citation and internal quotation marks omitted). Courts have credited claims of mental incapacitation attributable to the psychological impact of grief, domestic abuse, and sexual abuse. *See, e.g.*, *Doe*, 76 F.4th at 72 ("Likewise, several courts have recognized that the psychological impact of long-term or extreme sexual abuse can constitute an extraordinary circumstance that prevents a victim from coming forward even for some time after the abuse has ceased."); *Howard v. Leslie's Poolmart, Inc.*, No. 3:22-cv-418 (JBA), 2023 WL 5276394, at *5 (D. Conn. Aug. 16, 2023) (holding that equitable tolling was appropriate where plaintiff was "immobilized by grief" and subject to threats of domestic violence during the period to be tolled).

To ultimately prevail on a request for equitable tolling due to mental incapacitation, a litigant must provide a particularized description of how the person's condition adversely affected their ability to file in a timely manner. *See Boos v. Runyon*, 201 F.3d 178, 185 (2d Cir. 2000) (upholding summary judgment on a request for equitable tolling due to "vague and conclusory"

claims of mental incapacitation).  Claims of mental incapacitation at a pleading level, however, are often given latitude so that the plaintiffs may present evidence to meet their burden of particularity.  *See Mandarino*, 180 F.App'x at 261 (holding that the plaintiff's claim of a mental disability that impeded his "ability to perceive events . . . must be presumed to be true on a motion to dismiss, . . . even if . . . plaintiff's claims would be unlikely to survive summary judgment").

Plaintiff's first two arguments, ignorance of her legal requirements and pursuit of other remedies for her grievances, do not meet the "extraordinary circumstances" required to grant equitable tolling.  But her claims of harassment and mental incapacitation may.

Plaintiff contends that mental incapacitation rendered her unable to file in a timely manner. Specifically, she claims:

- Immobilization by "grief, anxiety, mental suffering, fear, depression," ECF No. 1 ¶ 84, and "PTSD," *id.* ¶ 98, caused by abuse she suffered at Dunkin' and her stalking and harassment by Nicholson, who was ultimately arrested; and

- "Grief," "isolation, and "mental incapacitation" during the relevant period caused by false police reports, threats, and contrived eviction proceedings by her landlord, sexually explicit messages from a neighbor, continued harassment by Nicholson, and the departure of her parents, *id.* ¶ 87.

Per the Second Circuit's injunction that questions of mental incapacitation not be resolved on a motion for dismissal, I allow Plaintiff's claim that her anxiety, fear, depression, and traumatic response inhibited her ability to file a discrimination claim to proceed for further factual development.  The only question remaining is if Plaintiff has alleged facts sufficient to show that she was diligent in pursuing her claims during this period.  I find that she has.  She alleges that she met with four attorneys to represent her claim during the relevant period, all of whom declined to

represent her.  *Id.* ¶ 86.  While this process was "devastating" and time-consuming, she persisted in seeking representation, and when she was finally successful in these efforts, her claim was filed within a day.  *Id.* ¶ 86, 90.  Such efforts plausibly fulfill the "reasonable diligence" required to grant equitable tolling.

Defendants argue that Plaintiff's significant efforts to retain counsel during the period to be tolled indicate instead that she knew of her deadlines, "was capable of action," and thus her failure to timely file indicates "garden variety neglect" and a lack of diligence.  ECF No. 19 at 2; ECF No. 13-1 at 8–9.

This argument is relevant to the ultimate questions of incapacitation and diligence, but it does not mandate dismissal at this early stage.  *See Mandarino*, 180 F. App'x at 261 ("Even if . . . plaintiff's claims would be unlikely to survive summary judgment[, he] was entitled to an opportunity to adduce evidence supporting . . . how he could have been mentally incapable of timely pursuing this action at the same time that he was able to pursue other [actions].").  To prevail in her argument that equitable tolling is warranted, Plaintiff will have to demonstrate that, during the period in which she was supposedly mentally incapacitated, she was in fact reasonably diligent in pursuing her claims.

Therefore, the Defendants' motion to dismiss Counts One, Two, Four, and Five is DENIED.

### B.  42 U.S.C. § 1981

Plaintiff also brings a discrimination claim against all defendants under 42 U.S.C. § 1981, alleging that she suffered adverse employment actions stemming from discrimination against her race and nationality, a hostile work environment created by discriminatory harassment, and retaliation for reporting this harassment.  Defendants argue that her claim should be dismissed because Plaintiff fails to show but-for causation between the alleged racial discrimination and

adverse employment actions.[1]  I find that while Plaintiff fails to allege sufficient factual content to meet her burden as to intentional racial discrimination and hostile workplace, she has satisfied the minimal pleading requirements under § 1981 for retaliation.  Therefore, for the reasons discussed below, Defendants' motion to dismiss Count Three is granted with respect to intentional discrimination and a hostile work environment and denied with respect to retaliation only.

1.  Intentional Discrimination

To establish a § 1981 claim for intentional discrimination in an employment context, a plaintiff must plead facts showing that "the plaintiff is a member of a protected class, . . . suffered an adverse employment action, and has at least minimal support for the proposition that the employer was motivated by discriminatory intent."  *Littlejohn v. City of New York*, 795 F.3d 297, 311 (2d Cir. 2015).

Regarding the second element, an adverse employment action is "one which is more disruptive than a mere inconvenience or an alteration of job responsibilities."  *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003) (internal quotation marks omitted).  "Examples of materially adverse changes include termination of employment, a demotion evidenced by a decrease in wage or salary, . . . a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation."  *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 85 (2d Cir. 2015) (internal quotation marks omitted).

---

[1] Defendants also argue that Plaintiff's § 1981 claim should be dismissed because white plaintiffs may utilize § 1981 only when their claim is linked to the rights of non-white persons, which Plaintiff fails to do.  ECF No. 13-1 at 10.  The Supreme Court and the Second Circuit have made it clear, however, that white litigants are not restricted from pursuing claims under § 1981 on the basis of discrimination against their race.  *See McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 295 (1976) (finding that white employees may bring claims under § 1981 because "the Act was meant . . . to proscribe discrimination in the making or enforcement of contracts against, or in favor of, any race"); *see also Vill. of Freeport v. Barrella*, 814 F.3d 594, 605 (2d Cir. 2016) ("§ 1981 also forbids so-called 'reverse discrimination'") (citing *McDonald*).

As to discriminatory intent, "a plaintiff pursuing a Section 1981 claim must plausibly allege that the defendant specifically intended to discriminate on the basis of race." *Underwood v. RTX Corp.*, No. 3:23-CV-310 (SVN), 2024 WL 3988142, at *4 (D. Conn. Aug. 29, 2024) (citing *Patterson v. County of Oneida, N.Y.*, 375 F.3d 206, 226 (2d Cir. 2004)). "It is . . . settled that Section 1981 does not prohibit discrimination on the basis of gender or religion, national origin, or age." *Anderson v. Conboy*, 156 F.3d 167, 170 (2d Cir. 1998). A plaintiff must also plausibly allege that race was a but-for cause in the defendant's actions. *See Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 589 U.S. 327, 341 (2020) (holding that a claim under Section 1981 must plausibly allege, that "but for race, [Plaintiff] would not have suffered the loss of a legally protected right"). "Accordingly, it is insufficient to merely plead that race was a motivating factor in the discriminatory action." *Underwood*, 2024 WL 3988142, at *4.

Here, Plaintiff is part of a protected class, as a white person pleading discrimination on the basis of her race. Her complaint contains allegations of the following adverse employment actions: the three write-ups Plaintiff was issued for improper store closure and her termination. ECF No. 1 ¶¶ 60–61, 67–68. As the write-ups were used as cause for suspending Plaintiff from work, and ultimately precipitated her termination, both actions led to a loss in material benefit for Plaintiff and are adverse employment actions. Read generously, Plaintiff's complaint also alleges that Calvo frequently changed Plaintiff's shifts to reduce her hours and to conflict with her school schedule for discriminatory reasons. *Id.* ¶¶ 49, 59. Accepted as true, this would constitute a material loss in pay and thus also qualify as an adverse employment action. *Vega*, 801 F.3d at 85.

Defendants argue that Plaintiff fails to allege facts showing that racial discrimination was a but-for cause in any adverse employment action she suffered. ECF No. 13-1 at 10. I agree. As Defendants rightly identify, the sole allegation related to racial harassment or discrimination in

Plaintiff's complaint is the following: "Defendants permitted its employees and managers to make fun and derogatory harassing comments about her color and Plaintiff's skin tone (white) and red hair." ECF No. 1 ¶ 45. First, there are no allegations suggesting that Defendants Thomas and Serpa had anything to do with this alleged racial harassment beyond the conclusory claim that they "permitted" it. Second, there are no allegations drawing any connection between the alleged racial harassment and Calvo's decisions to manipulate the Plaintiff's work hours, issue her write-ups for improper store closure, or ultimately terminate her. The Court thus has no grounds to infer that these adverse employment actions would not have occurred but for Plaintiff's whiteness.

Plaintiff does allege specific several incidents of harassment related to her nationality and accent. Section 1981, however, does not provide a cause of action for discrimination on the basis of national origin. *See Adams v. New York State Educ. Dep't*, 752 F. Supp. 2d 420, 470 (S.D.N.Y. 2010), *aff'd sub nom.*, *Ebewo v. Fairman*, 460 F. App'x 67 (2d Cir. 2012) (dismissing § 1981 claim because it sounded in discrimination for national origin). These incidents therefore have no bearing on this claim.

Plaintiff thus fails to plead sufficient factual content for me to draw a reasonable inference that she experienced any adverse employment action because of her race, and so her § 1981 claim based on intentional discrimination fails.

### 2. Hostile Work Environment

Plaintiff also alleges that the discriminatory harassment she suffered created a hostile work environment actionable under § 1981. "Section 1981 has been interpreted to provide a cause of action for *race-based* employment discrimination based on a hostile work environment." *Littlejohn*, 795 F.3d at 320 (emphasis added). To establish a hostile work environment, a plaintiff must allege facts showing "the workplace is permeated with discriminatory intimidation, ridicule,

and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993) (citation and internal quotation marks omitted). Courts must consider the totality of the circumstances in determining whether an environment is hostile or abusive, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 23.

For the same reason that Plaintiff's intentional discrimination claim under § 1981 fails, so too must her hostile work environment claim. Because racial discrimination is the sole concern in § 1981 actions, the Court must again confine its analysis to the plaintiff's allegations of racial harassment. From the one sentence in Plaintiff's complaint concerned with such harassment, she fails to identify (1) the actors who made racially discriminatory remarks to the Plaintiff, (2) what they said, (3) how often they said it, or (4) the effect these specific remarks had on Plaintiff. The Court is thus unable to draw any plausible inference as to the severity or pervasiveness of this alleged racial harassment. Such threadbare allegations are not sufficient to establish Plaintiff's claim beyond "labels and conclusions." *Twombly*, 550 U.S. at 555. Therefore, her § 1981 claim as to hostile workplace also fails as a matter of law.

### 3. Retaliation

Plaintiff also alleges that Defendants subjected her to retaliation in violation of § 1981. To establish a prima facie case of retaliation under the statute, a plaintiff must demonstrate that (1) she engaged in protected activity, (2) the defendant was aware of that activity, (3) she was subjected to materially adverse actions, and (4) there was a causal connection between the protected activity and the materially adverse actions. *Carr v. New York City Transit Auth.*, 76 F.4th 172, 180 (2d Cir.

2023).  Protected activities under § 1981 include internal complaints made by employees to management of racial harassment they have experienced in their employment.  *See Littlejohn*, 795 F.3d at 317 (protected activities include "when an employee communicates to her employer a belief that the employer has engaged in a form of employment discrimination").  The requisite causal connection can be shown either "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant."  *Id.* at 319.

Plaintiff alleges that she reported "bullying" to both Calvo and Buttercup HR, and thereafter her conditions became "significantly worse."  ECF No. 1 ¶ 38.  Specifically, she asserts that she complained of, *inter alia*, "harassment and discrimination" to Buttercup HR.  *Id.* ¶ 65.  When this allegation is read generously, it is reasonable to infer that her complaint included the racial harassment Plaintiff experienced, which qualifies as a protected activity under § 1981.  Taking all inferences in her favor, it is also reasonable to infer that her complaints to HR were known to Thomas and Serpa, and to Calvo through conversations with HR that a manager would have been expected to have surrounding Plaintiff's suspension and termination.  Plaintiff alleges several adverse employment actions, as discussed above.  Therefore, the only question as to her prima facie case is whether she has pleaded sufficient factual content establishing a causal connection between her complaints and the adverse employment actions.  I find that she has.

Plaintiff alleges no direct evidence of retaliatory animus from any Defendant.  She also does not identify when her complaints were made to HR, and so a temporal connection cannot be inferred between her complaint and any adverse employment action.  She does, however, allege that other employees who were engaged in the same conduct as Plaintiff—"purported[ly] closing

[the] store early with manager approval"—were not given write-ups for their actions, while Plaintiff was.  ECF No. 1 ¶ 61.  It is thus reasonable to infer that the write-ups were issued in retaliation for her complaint, ultimately leading to her termination.  In *Littlejohn*, the Second Circuit indicated that evidence of "disparate treatment of fellow employees who engaged in similar conduct" may fulfill a plaintiff's burden under the minimal pleading requirements of § 1981.  795 F.3d at 319.  "The facts required . . . in the complaint need not give plausible support to the ultimate question of whether the adverse employment action was attributable to discrimination.  They need only give plausible support to a minimal inference of discriminatory motivation."  *Id*.  When all inferences are drawn in Plaintiff's favor and when her assertions that she reported the racially discriminatory harassment are credited, Plaintiff has provided just enough factual material to raise a minimal inference that she was subjected to unlawful retaliation under § 1981.

For these reasons, I DENY Defendants' motion to dismiss Count Three of Plaintiff's complaint with respect to retaliation only.

### C.  Good Faith and Fair Dealing

Finally, Defendants argue that Plaintiff's Sixth Count, for breach of good faith and fair dealing in Plaintiff's at-will employment contract, should be dismissed because Plaintiff failed to (1) allege a real or implied employment contract, or (2) identify a public policy violated by her termination.  I agree.

Where there is no express or implied employment contract alleged by an employee, or any agreement distinct from the employment context, Connecticut courts have recognized a breach of good faith claim against an employer only if the employee can show that his or her termination violated an important public policy.  *See Magnan v. Anaconda Industries, Inc.*, 479 A.2d 781, 789 (Conn. 1984) (declining under a claim for breach of good faith and fair dealing to "enlarge the

circumstances under which an at-will employee may successfully challenge his dismissal beyond situation[s] where . . . his discharge involves . . . violation of public policy.") (citation omitted); *see also Dugan v. Eversource Energy Service Company,* No. AAN-CV-20-6040642-S, 2023 WL 4882755, at *10 (Conn. Super. Ct. July 28, 2023) ("The Supreme Court has recognized two instances where the covenant of good faith and fair dealing is applicable to the employment relationship[:]" where there is an express or implied contract, and where in their absence at-will employees are terminated for reasons in violation of public policy.). "In the absence of a public policy violation, there is no breach of the implied covenant of good faith and fair dealing." *Doherty v. Sullivan*, 618 A.2d 56, 60 (Conn. App. Ct. 1992).

Plaintiff has not alleged any express contract, implied contract, or any agreement distinct from the employment relationship. Therefore, her claim for breach of the covenant of good faith and fair dealing may only proceed under a cause of action for wrongful discharge due to violation of public policy.

To make such a claim, "the employee has the burden of pleading and proving that his dismissal occurred for a reason violating public policy." *Morris v. Hartford Courant Co.,* 513 A.2d 66, 68 (Conn. 1986). The employee must allege sufficient factual matter to establish three elements. First, she must identify a "particular public policy affronted by [her] termination." *Id.* "In evaluating claims, we look to see whether the plaintiff has alleged that his discharge violated any explicit statutory or constitutional provision or whether he alleged that his dismissal contravened any judicially conceived notion of public policy." *Geysen v. Securitas Sec. Servs. USA, Inc.*, 142 A.3d 227, 242 (Conn. 2016) (citations and quotation marks omitted). To fulfill this burden, Plaintiff must point to specific statutes and/or judicial authority that clearly articulates the public policy violated. *See Daley v. Aetna Life & Cas. Co.*, 734 A.2d 112, 134 (Conn. 1999)

(affirming judgment against plaintiff because she failed to identify any "explicit statutory or constitutional provision, or a judicially conceived notion of public policy").

Second, the public policy violation identified by the employee must bear a causal connection to her termination. *See Wong v. Bd. of Educ. of City of Bridgeport*, No. FBTCV186078060S, 2019 WL 2246206, at *2 (Conn. Super. Ct. Apr. 18, 2019) ("To allege wrongful termination based on the public policy exception, a plaintiff must allege causation—that is, that the discharge occurred for a reason violating public policy.").

Finally, the employee must have no statutory remedy available that can otherwise vindicate the public policy that has been violated. *Campbell v. Town of Plymouth*, 811 A.2d 243, 251 (Conn. App. Ct. 2002) ("A common-law approach to a claim of wrongful discharge is barred as long as a remedy has been made available to address the particular public policy concerns."). "The cases which have established a tort or contract remedy for employees discharged for reasons violative of public policy have relied upon the fact that in the context of their case the employee was *otherwise without remedy* and that permitting the discharge to go unredressed would leave a valuable social policy to go unvindicated." *Burnham v. Karl and Gelb, P.C.*, 745 A.2d 178, 182 (Conn. 2000) (citation omitted) (emphasis in original).

In her complaint, Plaintiff alleges that the Defendants engaged in bad faith through "retaliation, discrimination, harassment and creating and maintaining a hostile workplace." ECF No. 1 ¶ 159. Because Plaintiff must allege a causal connection between Defendant's acts of bad faith and her wrongful discharge, I will examine how the conduct Plaintiff alleges relates to her discharge.

Plaintiff was suspended for three write-ups she received for improper store closure, which led to her termination one week later. She alleges that these write-ups were "discriminatory" and

18

"retaliatory." *Id.* ¶ 60. Plaintiff has alleged several incidents for which she faced retaliation: for reporting Calvo's alcohol use and encouraging alcohol use among underaged staff, *id.* ¶ 33; for reporting the sexual and discriminatory harassment Plaintiff experienced, *id.* ¶¶ 38, 59, 63; for supposedly flirting with Calvo's boyfriend, *id.* ¶ 53; and for refusing to serve spoiled food at Calvo's command, *id.* ¶¶ 55–56. Plaintiff indicates in her opposition brief that a public policy violation may be linked to her reporting "serving alcohol at work, harassment and health and safety food violations," presumably through retaliatory termination. ECF No. 18 at 22. She also argues that Defendants violated public policy when Calvo provided her personal information, including home address, phone number and email address, to Nicholson. *Id.* at 20–21.

Defendant argues that the Plaintiff's complaints of termination due to discrimination and retaliation for reporting discriminatory conduct are given statutory remedy through Title VII, 42 U.S.C. § 1981, and CFEPA. Thus, they may not serve as the basis of her breach of covenant claim. I agree. Where Plaintiff's claims rest on discriminatory conduct and retaliation for reporting discrimination that may be given remedy through these statutes, her breach of good faith claim is not available. *See Knight v. Southeastern Council on Alcoholism & Drug Dependency*, No. 557182, 2001 WL 1231825, at *2 (Conn. Super. Ct. Sept. 24, 2001) (striking plaintiff's breach of implied covenant claim for wrongful discharge due to discrimination because the plaintiff had a statutory remedy through CFEPA).

Turning to Plaintiff's allegations that her termination was also due to reporting the misconduct related to spoiled food and providing alcohol to minors, Plaintiff cites no authority that indicates either behavior is in violation of statutory or judicially conceived notion of public policy. "Absent unusual circumstances, we will interfere with a personnel decision only if it implicates an *explicit* statutory or constitutional provision, or judicially conceived notion of public

policy." *Daley*, 734 A.2d at 133 (emphasis added); *see Storm v. ITW Insert Molded Prods.*, 400 F. Supp. 2d 443, 446 (D. Conn. 2005) (dismissing plaintiff's claim of wrongful termination because he failed to identify any statute or judicial authority identifying defendant's conduct as a violation of public policy). Therefore, Plaintiff has not met her burden in establishing an important and clearly articulated public policy violation on these grounds.

Finally, Plaintiff claims that Defendant's behavior violated a public policy against "unauthorized disclosure of personal private information" when Calvo provided her personal address and contact information to Nicholson. As support, plaintiff points to Conn. Gen. Stat. § 31-128f,[2] which forbids employers from revealing an employee's "individually identifiable information contained in the personnel file or medical records of any employee to any person or entity not employed by or affiliated with the employer without the written authorization of such

---

[2] The statute reads in full:

§ 31-128f.   Employee's consent required for disclosure.   No individually identifiable information contained in the personnel file or medical records of any employee shall be disclosed by an employer to any person or entity not employed by or affiliated with the employer without the written authorization of such employee except where the information is limited to the verification of dates of employment and the employee's title or position and wage or salary or where the disclosure is made: (1) To a third party that maintains or prepares employment records or performs other employment-related services for the employer; (2) pursuant to a lawfully issued administrative summons or judicial order, including a search warrant or subpoena, or in response to a government audit or the investigation or defense of personnel-related complaints against the employer; (3) pursuant to a request by a law enforcement agency for an employee's home address and dates of his attendance at work; (4) in response to an apparent medical emergency or to apprise the employee's physician of a medical condition of which the employee may not be aware; (5) to comply with federal, state or local laws or regulations; or (6) where the information is disseminated pursuant to the terms of a collective bargaining agreement.   Where such authorization involves medical records the employer shall inform the concerned employee of his or his physician's right of inspection and correction, his right to withhold authorization, and the effect of any withholding of such authorization upon such employee.

employee," absent several itemized exceptions irrelevant to this dispute.[3]  Here, Plaintiff is on firmer statutory ground.  Unlawful disclosure of employee information, as restricted by General Statute § 31-128f, has been recognized in at least one case as a legitimate public policy asserted by the Connecticut legislature.  *Giannecchini v. Hosp. of St. Raphael*, 780 A.2d 1006, 1012 (Conn. Super. Ct. 2000).

But Plaintiff has not pled the essential element of causation between public policy violation and termination.  Nowhere in her complaint does Plaintiff allege that her termination was related in any way to the disclosure of her personal information.  She does not plead that she made any complaint or report regarding this disclosure, or that she faced any retaliation or animus from any party because of it.  There is therefore no factual content in Plaintiff's pleadings that would permit an inference that Plaintiff's write-ups, suspension, or termination bore a causal relationship to Calvo's alleged violation of § 31-128f.  Because breach of good faith claims for violation of public policy must show a causal connection between the violation and termination, Plaintiff's claim must fail on these grounds as well.  *Li Li v. Canberra Indus.*, 39 A.3d 789, 794 (Conn. App. Ct. 2012) ("A failure to prove causation defeats the action in any event.").

For these reasons, I GRANT Defendants' motion to dismiss Count Six of Plaintiff's complaint.

---

[3] Plaintiff also suggests the provisions against unauthorized disclosure of personal information in the Health Insurance Portability and Accountability Act of 1996 (HIPAA) as the grounds for establishing unauthorized disclosure of employee information as a valid public policy.  For a statute to be applicable as proof of a valid public policy, however, it must specifically apply to the Plaintiff and the supposed violation.  *See Burnham*, 745 A.2d at 182–83 (holding that because the plaintiff failed to present evidence that her termination was in violation of the Connecticut whistleblower statute, § 31-51m, she could not "use the public policy embodied therein to support her claim of wrongful discharge based on a violation of public policy.").  HIPAA regulates the release of *medical records* by particular covered entities.  Plaintiff does not allege that a HIPAA-covered entity is a party to this dispute, or that her medical records were disclosed, so HIPAA may not serve as the statutory basis of her claim.

## IV.    CONCLUSION

For the foregoing reasons, the motion to dismiss is GRANTED for all defendants as to Count Three with respect to intentional discrimination and a hostile work environment and as to Count Six, and GRANTED for Defendants Bruce Thomas and Dinart Serpa as to Counts Ten, Eleven, and Twelve.  The motion is DENIED as to Counts One, Two, Three with respect to retaliation only, Four, and Five.

IT IS SO ORDERED.

_____/s/_____
Michael P. Shea, U.S.D.J.

Dated: Hartford, Connecticut
       July 31, 2025